Richard D. MERCER and Edward R. Lipski, Plaintiffs,

v.

ALLEGHENY LUDLUM CORPORATION and Richard P. Simmons, Defendants.

No. M8–85.

United States District Court, S.D. New York.

March 22, 1989.

Reed Smith Shaw & McClay, Pittsburgh, Pa., for plaintiffs; Bradley S. Tupi, of counsel.

Obermaier Morvillo & Abramowitz, P.C., New York City, for defendants; Barbara L. Hartung, of counsel.

Sullivan & Cromwell, New York City, for Goldman Sachs; Steven R. Lowson, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs Richard D. Mercer and Edward R. Lipski brought this motion before the undersigned in Part I to enforce subpoenas addressed to a non-party witness, Goldman, Sachs & Co. ("Goldman Sachs"). The underlying federal securities litigation, with pendent state and common law claims, against Allegheny Ludlum Corporation ("Allegheny Ludlum") and Richard P. Simmons is pending in the United States District Court for the Western District of Pennsylvania before Hon. Glenn E. Mencer, United States District Judge. Plaintiffs' deposition subpoenas *duces tecum*, in aid of the action pending before Judge Mencer, were served in this district. Plaintiffs invoke Rules 37 and 45, F.R.Civ.P. The issues posed by the original motion papers have been significantly narrowed by the agreement of counsel, but certain disputes remain.

Briefly stated, plaintiffs Mercer and Lipski are former employees and stockholders of Allegheny Ludlum. They both retired from the company on November 30, 1986. On that date, Mercer owned 5,000 shares in Allegheny Ludlum. Lipski owned 2,500 shares. The company's stock restriction plan then in force required Mercer and Lipski, upon their retirement, to sell their shares to Allegheny Ludlum for "book value." As of November 30, 1986, Allegheny Ludlum valued its shares at $322.80 per share. In consequence, on November 30, 1986 Mercer sold his shares to the company for $1,614,000. Lipski sold his shares for $807,000.

It is common ground that Goldman Sachs had been providing investment banking and related services to those in control of Allegheny Ludlum's destinies since 1984. Pursuant to a letter of engagement dated September 11, 1986, Goldman Sachs confirmed its authority "to represent Allegheny Ludlum Corporation ... in all negotiations looking to the possible sale of the Allegheny Ludlum Corporation by way of a merger, a sale of all or a portion of the assets or stock of the Allegheny Ludlum Corporation, or otherwise."

In point of fact, with Goldman Sachs' assistance Allegheny Ludlum put together an initial public offering of its stock on May 8, 1987 (the "IPO").

The complaint alleges (¶ 27) that as of May 8, 1987, "the presplit Allegheny Ludlum Corporation shares of common stock were valued at $6,250 per share."

Based upon the dramatic difference between that alleged $6,250 per share valuation and the "book value" of $322.80 per share calculated by the company when it purchased plaintiffs' shares only five months previously, plaintiffs commenced the underlying action in the Western District of Pennsylvania. The case for plaintiffs is that prior to their retirement in November 1986, the corporate "insiders" (including defendant Simmons, Allegheny Ludlum's chairman of the board and chief executive officer) concealed from and misrepresented to plaintiffs facts concerning the value of the company's stock and the company's then-existing future plans for the company and its securities. Plaintiffs allege that as a result they were induced to retire and resell their stock to the company at an artificially low price. Thus Count I of the complaint, for securities fraud, alleges at ¶ 50:

"Had plaintiffs known of the material information not disclosed by defendant, they would not have retired and would not have sold their securities to Allegheny Ludlum Corporation, or they would

not have sold their securities at such a low price."

Each plaintiff alleges damages as "being the difference between the amount paid by Allegheny Ludlum Corporation for his shares on November 30, 1986 and the true market value of those shares." ¶¶ 51, 52.

Goldman Sachs, a key player in the game, is clearly a potential source of information as to whether defendants were playing by the rules. Rule 26(b)(1) provides generally for the scope of discovery. Plaintiffs "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter" of their claims. "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

The remaining disputes focus primarily upon Goldman Sachs' actions on behalf of Allegheny Ludlum, and documents generated by those actions, subsequent to May 8, 1987, the date of the IPO. Counsel for Goldman Sachs disclaims the May 8, 1987 date as a bright line of demarcation between the appropriate and inappropriate areas of inquiry, and points out, in that regard, that it has furnished some documents generated subsequent to that date. But the main thrust of Goldman Sachs' position is to consign events and documents subsequent to the IPO to the realm of the undiscoverable. That appears clearly enough from the manner in which counsel for Goldman Sachs poses the issue in its brief in opposition at 3:

"Whether Goldman Sachs must produce documents, and answer questions at a deposition, concerning non-public or other transactions and services which are wholly unrelated to the issue in the action that Goldman Sachs undertook on behalf of Allegheny subsequent to the May 1987 initial public offering."

Plaintiffs' somewhat more terse summary of the dispute appears at their brief at 3:

"Whether Goldman may continue to withhold documents prepared or obtained after May 8, 1987 on grounds of relevancy."

This dispute manifested itself during the two depositions of Goldman Sachs noticed by plaintiffs. The witnesses were Kevin W. Kennedy, a Goldman Sachs partner active on the Allegheny Ludlum account, and Tacey B. Phillips, an associate.

It is quite true that the focal point of plaintiffs' outrage, as pleaded in their complaint, is the significantly greater share valuation alleged to be a component of the May 1987 IPO. And, as noted, the only specific measure of damages presently pleaded by plaintiffs is the difference between the amount Allegheny Ludlum paid plaintiffs for their shares on November 30, 1986 "and the true market value of those shares." Plaintiffs do not specify in their complaint the date upon which that true market value should be calculated, but the thrust of their fraud theory appears to be that the company's "insiders" kept plaintiffs in the dark in respect of the IPO, then under active consideration with the assistance of Goldman Sachs.

Consequently, one may plausibly regard the May 1987 IPO as both the culmination of defendants' fraud against plaintiffs, and the benchmark date by which the amount of plaintiffs' resulting damages should be calculated. However, assuming *arguendo* that to be the case—and I put it no higher than that—it does not follow that plaintiffs may not obtain discovery in respect of post-May 1987 documents or activities involving Goldman Sachs.

Conceptually at least, it is not difficult to imagine post-IPO investment banking advice or services which, upon analysis, may shed some light upon Allegheny Ludlum's true value at the time plaintiffs retired and sold their shares. At oral argument, counsel for plaintiffs referred to a generous post-IPO dividend which, viewed in the totality of the circumstances, might cast doubt upon the *bona fides* of the book value calculated in respect of plaintiffs' shares. Plaintiffs' counsel also appeared to identify that dividend as being relevant to plaintiffs' damages, on the theory that if they had not been fraudulently induced to sell their shares, they would have participated in the dividend. Counsel for Gold-

man Sachs correctly pointed out that the complaint as presently drawn focuses in respect of damages solely upon differences in share valuation, which strictly construed would not include a claim for lost dividends. On the other hand, the complaint quite clearly alleges that defendants' fraud caused both their retirement and the sale of their shares, *see, e.g.,* ¶ 50; and Rule 15 permits amendments of pleadings, either pre-trial or to conform to the proof. Of course, it is for plaintiffs to make such a motion if so advised; and for Judge Mencer to grant or deny it if they do so.

The reference to the post-IPO dividend is not intended to be exclusive. One can postulate without particular difficulty the existence of other Goldman Sachs documents which, despite their relatively recent vintage, might shed light upon the relevant issues. Indeed, plaintiffs offer no more than a postulation; but they say it is reasonable given the circumstances, and all that Rule 26(b)(1) requires. Goldman Sachs, through its counsel, answers in essence that counsel have looked at the Goldman Sachs files; that they have given to plaintiffs' counsel everything relevant to the issues; and that plaintiffs must be content with that declaration.

I mean no disrespect to Goldman Sachs or to its counsel when I conclude that this is not sufficient. Reasonable persons may differ on what is discoverable under the broad provisions of Rule 26(b)(1). Technically Goldman Sachs is a non-party witness; but it is closely related to its continuing client, Allegheny Ludlum, which has agreed to indemnify Goldman Sachs from the expense of proceedings such as these. Plaintiffs are not, in my judgment, required to accept the disclaimer of non-relevance from Goldman Sachs or its counsel in respect of documents which to date they have not been permitted to inspect.

Accordingly I direct Goldman Sachs to produce those documents encompassed by the subpoenas *duces tecum* in this case, including documents prepared or obtained after May 8, 1987 and up to and including the date of December 31, 1988. The more remote in time the documents become from the date of plaintiffs' retirement in November 1986, the less likely they are to contain relevant information, or to lead to admissible trial evidence. Accordingly I impose this cut-off date, without prejudice to plaintiffs' later application to enlarge the date upon a showing of good cause.

Goldman Sachs' counsel stress in their brief and oral argument the objection that such documents contain material or information "proprietary" to Goldman Sachs or to Allegheny Ludlum. That is true enough, but of little demonstrated practical consequence in this case. There is no showing that plaintiffs are currently in active competition with either Goldman Sachs or its client; and there is in place a confidentiality order signed by Judge Mencer which appears adequately to address such concerns.

The sensible procedure to be followed, and which accordingly I direct, is for counsel for Goldman Sachs to furnish these additional documents to plaintiffs' counsel, all in accordance with the confidentiality order which Judge Mencer endorsed on October 28, 1988. Counsel for Goldman Sachs may also redact from the documents to be produced portions as to which claims of attorney-client privileges or work product immunity, so long as such claims are accompanied by the requisite particularity which I gather the parties have now agreed upon. This document production is to be made within a time mutually agreeable to plaintiffs and Goldman Sachs, failing which the Court will make a further order.

Following such production, the depositions may resume. Plaintiffs are directed first to continue and complete the deposition of Ms. Phillips; and then, if so advised, to ask for the continuation of the deposition of Mr. Kennedy. I reject Goldman Sachs' contention, joined by defendants, that plaintiffs voluntarily terminated the Kennedy deposition and cannot now ask that it be continued. The transcript of the Kennedy deposition makes it clear that the actions of plaintiffs' counsel were motivated in significant part by the denial to them of documents which I have now held must be produced.

The parties are directed to proceed in conformity with this opinion. A copy is being mailed to District Judge Mencer.

It is SO ORDERED.